## APPEAL OF V. J. BULLEIT.

Docket No. 2709. Submitted June 1, 1925. Decided February 9, 1926.

1. A corporation had a contract for the acquisition of oil leases, which it assigned to its stockholders upon their agreement to assume all of the obligations under the contract, each stockholder to pay cash to the seller in an amount equal to 40 per cent of his stockholding in the company and the balance of the purchase price to be paid out of the oil run. The stockholders, also out of the oil run, were to have returned to them the amount of cash which they had paid. Upon completion of both payments from the oil run, the stockholders were to transfer the oil leases to the company and receive therefor stock of par value equal to the amount of cash they had paid under the contract and for which they had received reimbursement out of the oil run. After the payments had been made by the stockholders to the former owners of the oil leases, of cash and out of the oil run, the agreement between the stockholders and the company was changed. No cash was returned to the stockholders out of the oil run, but the oil leases were transferred to the company for stock in the company having a par value equal to twice the amount of cash that

the stockholders had paid under the purchase contract. The tax-payer paid $1,200 in cash in 1918, along with other stockholders, and in 1919 received 2,400 shares, of $1 par value each, of stock for his interest in the oil leases. *Held*, the taxpayer realized a gain in 1919 of the difference between his cash investment of $1,200 and the fair market value of the 2,400 shares of stock on the date of transfer and receipt.

2. The taxpayer acquired several parcels of certain stock at different prices and later sold some of it. It is impossible to identify the shares sold with any particular shares acquired. Some of the shares held were acquired through exercise of stock rights. *Held*, that the average cost per share of all stock acquired is the proper basis for computing gain or loss on the shares sold.

3. Value of stock of Belle Point Oil Co., received in exchange for property, for purpose of determining gain or loss, fixed, in the light of the evidence, at 50 cents per share.

*W. Pratt Dale, Esq.*, and *W. H. Hartman, C. P. A.*, for the taxpayer.

*Lee I. Park, Esq.*, for the Commissioner.

Before IVINS, MARQUETTE, and MORRIS.

This appeal is from the determination of a deficiency in income tax for the year 1919, in the amount of $16,619.04.

The deficiency letter also showed a deficiency in tax for 1920 of $262.04, and an overassessment for 1921 of $6.79. No question is raised relative to the determinations for 1920 and 1921.

The questions raised are whether the taxpayer realized gains from three different transactions. The Commissioner, in his answer, presents the further question whether the deficiency should be increased over the amount shown in the deficiency letter.

FINDINGS OF FACT.

The taxpayer is a resident of Louisville, Ky., and was a stockholder in the Old Dominion Oil Co. during the years 1918 and 1919.

At a meeting of the stockholders of the Old Dominion Oil Co., held on August 17, 1918, the following resolution was adopted:

Resolved, That the contract made by the officers and directors of this company with the Southwestern Petroleum Co. and the Cliff Petroleum Co., as shown by the minutes of the meeting of the directors of this company held August 16, 1918, be, and the same is now hereby in all things confirmed and ratified; and that the officers and directors be further advised to pay the sum of $30,000 to M. C. Clay and W. J. Flesher, and be authorized and directed to accept $6,000 rebate on some of the cash payments mentioned in said contract, by reason of the royalties being somewhat higher than the original negotiations on the M. J. Brandenburg lease of 19.25 acres.

Said resolution so offered was unanimously carried, there being no stockholder voting in the negative; and it was so ordered.

Whereupon the following resolution was offered by Charles W. Schindler, and seconded by Michael Zier, both stockholders of record and personally in attendance at said stockholders meeting;

Resolved, That the officers and directors of the company be, and they are now hereby authorized and directed to amend the articles of incorporation of the Old Dominion Oil Co., increasing the shares of the capital stock from $500,000 to $750,000, and that the president and a majority of the board of directors be authorized and directed to execute such amended articles of incorporation and record the same, and file the same with the Secretary of State of the Commonwealth of Kentucky, in order to effect such increase; and that the officers and directors of such corporation be authorized and directed to do any and all other necessary and proper things to be done, and sign all other necessary and proper papers to be signed in order to effectually carry out this resolution, and to amend said articles of incorporation increasing the capital stock from $500,000 to $750,000.

After a full discussion, the motion was unanimously carried, and the following amended articles of incorporation were presented.

[Form of such amended articles was omitted.]

After which your committee reported, which report was unanimously adopted, that the Old Dominion Oil Company's contract with the Southwestern Petroleum Co. and the Cliff Petroleum Co. be sold and assigned to and assumed by each of the stockholders of the Old Dominion Oil Co. agreeing thereto equally and ratably, in proportion to their present holdings of stock in the Old Dominion Oil Co. and that each agreeing stockholder furnish the necessary sums of money required of him to pay the gross sum of $200,000 in cash to the Southwestern Petroleum Co. and the Cliff Petroleum Co., as provided in and by the contract of August 12, 1918.

There being $500,000 of outstanding capital stock of the Old Dominion Oil Co., this will require a payment by each of such stockholders of 40 per cent of their present holding of stock in the Old Dominion Oil Co.

That when each of said stockholders have paid said sums of money equivalent to 40 per cent of their present stockholdings in the Old Dominion Oil Co., aggregating a total of $200,000, that they and each of them making such payments be the owners of all the rights, title and interest in [and] to the aforesaid contract of August 12, 1918, in proportion to their said respective payments; and that the officers of the Old Dominion Oil Co. be required to and keep a record of all such payments so made by each of its said several stockholders, with a contract running to each of them individually, which likewise shall run to all of them jointly and severally, to pay to them out of the oil runs from the property purchased in and by the said contract of August 12, 1918, the full sum of $200,000 in cash, without interest, along with and at the times that the $200,000 in oil mentioned in said contract of August 12, 1918, is paid to the Southwestern Petroleum Co. and the Cliff Petroleum Co.

That further, when each of said payments have been fully made out of the oil runs from said property, namely, $200,000, to the Southwestern Petroleum Co. and the Cliff Petroleum Co., and $200,000 to the stockholders furnishing the aforesaid $200,000 in cash, as shown by the books of company, then that there be immediately purchased from said parties said contract, by issuing to each party this company's stock at par value equal to the amount of money payable by him.

That is to say, when the property purchased by and as a result of the oil runs under such contract of August 12, 1918, has paid for itself in full, then,

and not until then, shall stock be issued to each of the parties furnishing the aforesaid funds. The consideration being that the furnishing of such $200,-000 in cash, without interest, for the period necessary and proper that may be required to secure all of said money from the production of oil runs on the property so purchased, enables said Old Dominion Oil Co. to own the property purchased in and by the contract of the 12th day of August, 1918, without paying for it out of its own resources, and without being at any expenditures whatever on account of the purchase price of the property, or any other sum than amounts required to drill in and operate said property.

It is understood that the sums mentioned herein to be paid are to be produced from said properties out of the net working interest, after payment of oil royalties, and that one-half of said net working interest is to go to the Southwestern Petroleum Co. and the Cliff Petroleum Co., and the other half of such working interest is to be credited to and ultimately paid to the parties furnishing the $200,000, as shown by the books of the corporation, and as mentioned herein; and that the stock issue following that fact is to be paid to the parties furnishing said funds, in exact proportion to the amount of moneys so furnished by them.

And further, that when each of said parties so furnishing said $200,000 have been fully paid as mentioned herein, without interest, and stock issued to them as mentioned herein, and the Southwestern Petroleum Co. and the Cliff Petroleum Co. have likewise been paid the $200,000 mentioned in the contract of August 12, 1918, then the properties shall become the sole and absolute property of the Old Dominion Oil Co., and all the rights, interests and privileges mentioned in the contract of August 12, 1918, shall automatically revert to and become the absolute property of the Old Dominion Oil Co.

The taxpayer owned stock of par value $3,000, and, on October 7, 1918, he paid $1,200 to the sellers of the oil properties. On August 20, 1919, he received 2,400 shares of Old Dominion Oil Co. stock of the par value of $1 each. No cash was paid to him in accordance with the resolution, but he accepted 2,400 shares of stock for his interest in the two oil leases. The fair market value of the stock on August 20, 1919, was $1.75 per share.

On the basis of the market value of the stock being $1.75 per share, the Commissioner determined that the taxpayer had loaned $1,200 to the Old Dominion Oil Co. and had received interest from that transaction in the amount of $2,100, and increased his taxable income by that amount.

During the year 1919, the taxpayer was the owner of shares of stock in the Pyramid Oil Co., represented by three certificates, as follows:

3,895 shares, which had cost him $2 a share, represented by one certificate.
5,000 shares, which had cost him $0.50 a share, represented by one certificate.
1,500 shares, which had cost him nothing, represented by a certificate for 5,000 shares, the other 3,500 shares having been given by him to his daughter, without being transferred on the company's books, he having undertaken to sell them for her.

10,395

The taxpayer, during 1919, sold in one lot 7,000 shares of this stock, at $1.20 a share. He forwarded for transfer the certificate for 3,895 shares, which had cost $2 a share, with instructions that it be transferred in full, and the certificate for 5,000 shares, which had cost 50 cents a share, with instructions that from it there be transferred the needed balance to complete the 7,000 shares sold.

At the time of this sale the taxpayer was the beneficial owner of no other stock in this corporation than that mentioned above.

The taxpayer reported a loss on this transaction. The Commissioner, on the theory that, at the time of sale, the taxpayer was the owner of 42,743 shares, which had cost him an average of 57.82 cents per share, found a gain of $4,352.60.

On February 21, 1919, the taxpayer, in his own name, but acting for a syndicate composed of two other individuals and himself, entered into a contract with the Hopewell Petroleum Co. to purchase all of its capital stock, or, if all of the stockholders would not assent, then to purchase all of the assets of that company, and to pay therefor:

| | |
|---|---:|
| Cash | $200,000 |
| 200,000 shares of the capital stock of a company to be organized, at 50 cents a share | 100,000 |
| From oil production | 60,000 |
| Total | 360,000 |

The syndicate then organized a company, known as the Belle Point Oil Co., under the laws of Delaware, having an authorized capital stock of 1,000,000 shares of the par value of $1 each. The certificate of incorporation, dated February 27, 1919, provided, in part, as follows:

The total authorized capital stock is ONE MILLION DOLLARS ($1,000,000), divided into one million (1,000,000) shares of the par value of One Dollar ($1.00) each.

Of the One Million Dollars authorized capital stock Nine Hundred Thousand ($900,000.00) Dollars shall be fully paid up and non-assessable and delivered to V. J. Bulleit, or upon his order to such other persons as he may request, in the transfer and delivery to this corporation of the following leases, bearing a royalty to the lessors of one-eighth (1/8th), together with such sub-leases as have been made with and to others for the active drilling of said leases.

The properties referred to were all previously owned by the Hopewell Petroleum Co. and were included within the transfer covered by the contract with the taxpayer, hereinbefore referred to.

The certificate of incorporation further provided:

And the $100,000 shall be sold for cash at par. By "cash" it is meant herein that the subscriptions to said stock shall be paid in cash within a reasonable time, which shall be construed to mean from one to four months.

The syndicate then transferred to the Belle Point Oil Co. all of the property previously owned by the Hopewell Petroleum Co. The syndicate received in its own right 900,000 shares of the capital stock of the Belle Point Oil Co., and the latter assumed the liability of the syndicate to pay the $60,000 in oil produced; the syndicate also obligated itself to sell the $100,000 of treasury stock retained by the Belle Point Oil Co., at $1 a share, so that the corporation would have $100,000 of cash in its treasury for development purposes.

The syndicate delivered to the Hopewell Petroleum Co., or to its stockholders, the 200,000 shares of stock in the Belle Point Oil Co., at the agreed value of 50 cents a share. The syndicate then took subscriptions for stock in the Belle Point Oil Co., under an arrangement by which it sold its own stock at 50 cents a share, every subscriber to a thousand shares of syndicate stock being required to subscribe for 150 shares of the treasury stock at $1 a share. The syndicate sold 546,421 shares at 50 cents a share, thereby realizing $273,210.50, of which amount $200,000 was paid to the Hopewell Petroleum Co., $9,180 was paid to the Belle Point Oil Co., to make up the balance of $100,000, agreed upon for its development purposes. In disposing of the stock throughout the entire transaction, the syndicate incurred net expense amounting to $16,446.51. One hundred and fifty three thousand five hundred and seventy nine unsold shares remained in the hands of the syndicate.

The Commissioner determined a gain to the taxpayer from the transaction last referred to in the amount of $44,518, and, by reason thereof, and other matters mentioned in our findings, determined a deficiency in tax for the year 1919 in the amount of $16,619.04.

### DECISION.

The deficiency should be computed in accordance with the following opinion. Final determination will be settled on 7 days' notice, under Rule 50.

### OPINION.

MORRIS: The transaction involving the stock of the Old Dominion Oil Co. we conclude to have been as follows: The company had a contract for the acquisition of two oil leases, being obligated to pay, $200,000 in cash and $200,000 out of the oil production, or a total of $400,000. It assigned the contract to its stockholders, each of whom agreed to pay an amount of cash equal to 40 per cent of his holdings in the company. The taxpayer owned $3,000 par value of stock, and, accordingly, was obligated to pay $1,200 to the owners of the two properties in the contemplated purchase. He did so, and presumably all of the stockholders did likewise. Thereupon,

they became associated as owners of the enterprise related to those two properties, subject to the performance of the contract and compliance with the resolution. Apparently, the company was to operate the two oil properties so acquired by the stockholders and, out of the oil production, to pay the balance of $200,000 of the purchase price and to credit to, and ultimately repay, the stockholders $200,000 for the cash they had paid. When those payments had been made, the stockholders were to transfer the two properties to the company and receive as a group (but with division based upon their proportionate ownership of stock at the time of their joint payment of the $200,000 to the former owners of the two properties) $200,000 par value in stock of the company. In other words, taking the taxpayer as an illustrative stockholder, for an investment of $1,200 in cash in the oil properties there was to be a return of $1,200 in cash during the period of the joint ownership with other stockholders (or the return of the investment) and 1,200 shares of stock upon a transfer of the properties to the company. But the transaction was not so carried out. The taxpayer received nothing in cash, and thereby must have agreed to some new arrangement. The oil properties were transferred to the company on August 20, 1919, and the taxpayer then received 2,400 shares of stock of the par value of $1 each, but having a then market value of $1.75 a share, or a total value to the taxpayer of $4,200. He had paid for his interest in the two properties $1,200, and so had a resulting gain from the transaction of $3,000.

The Commissioner construed the transaction to be a loan by the taxpayer of $1,200, which was paid back in the form of $1,200 par value in stock, which payment he treated as the equivalent of $1,200 in cash, and the other $1,200 par value in stock to be in the nature of interest for the use of the money so loaned. In determining the amount of interest received, the Commissioner noted the market value of the stock on the date of receipt to be $1.75 a share, and credited the taxpayer with the receipt of income, in the form of interest, in the sum of $2,100. Upon the record presented to us there was no evidence that the transaction was a loan, but rather an investment. It is true that the resolution of the company states that the individuals were to receive out of the oil runs " the full sum of $200,000 in cash, without interest," but no money was, in fact, paid to the company as a loan or otherwise. To the contrary, the contract obligations of the company were assigned absolutely to the individual stockholders, and the $200,000 payment was made by them direct to the former owners. So, the " $200,000 in cash, without interest," could only mean that the company would have no right to insist upon a transfer to it until the individuals had received the flat amount, and no more, of $200,000. Accordingly, it is our conclusion that the

addition to income was not the $2,100 determined by the Commissioner, but the sum of $3,000 gain, resulting from the transfer.

The taxpayer, at the time of making a sale of Pyramid Oil Co. stock in 1919, was the owner of 10,395 shares. The cost to him of these shares was as follows:

| | |
|---|---|
| 3,895 shares at $2 | $7, 790 |
| 5,000 shares at 50 cents | 2, 500 |
| 1,500 shares at 0 cents | 0 |
| 10,395 shares, at a total cost of | 10, 290 |

Of these, he sold 7,000 for $8,400. He forwarded his certificate for 3,895 shares (which we shall call A for convenience), and his certificate for 5,000 shares (which we shall call B) to the transfer agent of the corporation, with instructions to transfer to his vendee all of the 3,895 shares represented by certificate A, and 3,105 shares out of those represented by certificate B. It does not appear whether this was done or not—the Commissioner acted on a theory which made it unimportant, and whether the wishes of the taxpayer had been carried out or whether (as the Commissioner claimed but did not prove) the transfer agent actually transferred all 5,000 shares represented by certificate B and 2,000 out of certifiicate A. He found, for the purpose of making his determination, that the taxpayer had acquired the $2 stock through the exercise of rights to subscribe at that price which had been issued to stockholders, and applied article 39, Regulations 62, as amended by T. D. 3403, averaging the cost of stock held, and computing the profit on stock sold on the basis of this average cost. But he also found that the taxpayer was the owner of 42,743 shares of stock which had cost him an average of 57.82 cents per share.

But the taxpayer contends that he intended to sell his $2 stock first and his 50-cent stock next. He made somebody his agent to transfer the stock on the books of the company, and the Commissioner claims that the agent did not carry out instructions but transferred the 50-cent stock first and the $2 stock second.

The taxpayer adduced no proof of the order of sale; neither did the Commissioner. We have a situation where we are unable to find affirmatively which stock was sold first and which second; where we can not identify the sold stock with the different parcels of held stock. The Commissioner acted on the theory that some of the stock was acquired under rights to subscribe issued on account of the taxpayer's stockholdings. There is nothing in the record to refute this. And there is nothing to show to which of the 50-cent stock or the stock which cost the taxpayer nothing (it must have been received as a bonus or as a dividend,) the rights to subscribe for the $2 stock were ascribable. In the circumstances, we

think the Commissioner was right in theory—that the gain or loss should be computed on a basis of the average cost of all the stock acquired, just as in the case of a sale of stock after a stock dividend. But the Commissioner's theory must be applied to the existing facts.

The uncontroverted evidence of the taxpayer shows that he was trustee of certain stock, that prior to the gift of 3,500 shares to his daughter he was the owner of 13,895 shares which cost him $10,290, or an average of 74.05 cents per share. He sold 7,000 shares of the 10,395 which he owned at the date of sale, at $1.20 a share, realizing a gain therefrom of 45.95 cents per share, or a total gain of $3,216.50, instead of $4,352.60 as determined by the Commissioner.

Relative to the gain resulting from the syndicate transaction in Belle Point Oil Co. stock, the taxpayer's argument is predicated upon the premise that 900,000 shares of that company's stock cost the syndicate 40 cents a share, or $360,000. The syndicate delivered 200,000 shares to the Hopewell Petroleum Co., at a value which was agreed upon for their purposes of 50 cents a share, with the result that the apparent total purchase price was $360,000. But the Belle Point Oil Co. relieved the syndicate of the $60,000 obligation, and the syndicate actually sold 546,421 out of the 700,000 shares at 50 cents a share, realizing therefrom $273,210.50. Of the latter amount the syndicate paid out as follows:

Hopewell Petroleum Co_____ $200,000.00
Syndicate expense (net)_____  16,446.51
Belle Point Oil Co. to balance $100,000 for development purposes__   9,180.00

                                                                225,626.51

The resulting cash profit was $47,583.99. In addition, the three members of the syndicate had 153,579 shares of stock free and clear. At a valuation of 50 cents a share, the total gain to the syndicate was $124,373.49, and the portion attributable to the taxpayer was $41,457.83, instead of $44,518 determined by the Commissioner and $29,548.58 contended for by the taxpayer. The latter amount results from disregarding entirely the 153,579 shares and from increasing the gain of the syndicate by the $60,000 liability assumed by the Belle Point Oil Co. with the adjustments.

To be sure, there are syndicate transactions in which it is not proper to treat unsold stock on the basis of the sale price of sold stock, but we do not consider that such a situation is now before us. There was no evidence in this appeal that the syndicate could find no market for the 153,579 shares. It is just as permissible to assume that the shares were not sold because the three members of the syndicate expected to sell later for more than 50 cents a share, as it is to assume that the market was saturated. That they saw fit to pay $9,180 in cash to the company, is not inconsistent with their

desire to retain stock rather than to sell it to others at a lower price than they expected to realize later.  Certainly those who bought the syndicate stock at 50 cents considered it worth more, since they simultaneously bought treasury stock at $1 a share.  We have had presented to us no better evidence of the value of the 153,579 shares than the market price obtained on sales of the 546,421 shares of like stock, which was 50 cents a share.  Accordingly, the gain realized by the taxpayer from the sale of the assets of the Hopewell Petroleum Co. to the Belle Point Oil Co. was $41,457.83.